GARY M. RESTAINO
United States Attorney
District of Arizona
MONICA E. RYAN
NATHANIEL J. WALTERS
Assistant U.S. Attorney
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Monica.Ryan@usdoj.gov
Nathaniel.Walters@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, <br><br> Plaintiff, <br><br> vs. <br><br> Larry Edward Brown, Jr., <br><br> Defendant. | CR-24-00355-PHX-SPL <br><br> GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (Doc. 50) |

The United States, through undersigned counsel, responds to Defendant Larry Edward Brown Jr.'s (Brown) Motion to Suppress (Doc. 50). For the reasons set forth below, and any evidence adduced at a hearing, Defendant's motion to suppress should be denied. Defendant's statements were spontaneous and not in response to any questioning. These statements were made voluntarily and were not the result of coercive police activity.

I.  **FACTS**

  A. Events of August 17, 2023

As alleged in the Indictment, on August 17, 2023, IRS Criminal Investigation agents were at the firearms range at FCI Phoenix for standard pistol qualifications and classroom training. After training had concluded for the day, Special Agents Patrick Bauer and Larry Brown, both Use of Force Instructors, were alone together in a small, one-room structure known as the Tower. While inside the Tower, the Defendant shot Agent Bauer.

The defendant immediately ran out of the Tower, alerted the other agents present about Agent Bauer's injury and called 9-1-1 at 11:08 a.m. Agent Bauer was transported by ambulance to the closest Level I Trauma Center. Despite lifesaving efforts by the EMTs and hospital staff, Special Agent Bauer died as a result of a single, penetrating gunshot wound to his torso.

After the ambulance carrying Special Agent Bauer left the scene, Brown was transported by IRS-CI Supervisory Special Agent Tina DeAndre to the Honor Health Sonoran Crossing Medical Center (SCMC) hospital for evaluation.

Upon notification of a federal agent being shot at the FCI firearms range, FBI agents responded to the range, to the hospital where Agent Bauer was being treated, and to the hospital (SCMC) where Brown was being treated.

B. Statements of Defendant Larry Brown at SCMC

The first FBI agent to arrive at SCMC was Special Agent Taylor Hannah, at approximately 1:20 p.m. She located Defendant's room in the Emergency Department and spoke to SSA DeAndre, who told Agent Hannah that IRS management had informed her that IRS-CI would be handling the investigation, and that neither she nor Brown would make any statements to the FBI. Agent Hannah responded that the FBI was handling the investigation. Agent Hannah knocked on the door of Brown's hospital room and asked Defendant if she could come in. Defendant nodded in response, so Agent Hannah entered the room. Agent Hannah introduced herself and told Defendant that the FBI was investigating the shooting that had happened at the range. Agent Hannah first asked Defendant if he was armed. In response, he lifted his shirt, and she observed that his duty belt included one empty magazine pouch and did not include a holster or firearm. At this time, nurses were coming in and out of the room, so Agent Hannah stood back to stay out of their way. Agent Hannah observed that Defendant was crying and rocking back and forth with his eyes closed, saying repeatedly to himself, "I am a Use of Force Instructor, I should know better, I teach this." The Defendant's statements were not made in response to any questions from any of the other people in the room.

Agent Hannah told the Defendant that she was there to find out what happened at the range, but based on her observations of Defendant's emotional state she decided it was not an appropriate time to interview him, so she told Defendant that she would reach out to him later to set up a time to talk. Agent Hannah gave Defendant her contact information, which he saved in his cell phone. Defendant's wife arrived at approximately 1:45 p.m., and Agent Hannah left the room to give them time to talk.

Hospital staff asked all of the various law enforcement personnel to wait in a nearby conference room. When agents at SCMC learned that Agent Bauer had died, Agent Hannah left the conference room to alert nursing staff that the Defendant would be receiving very bad news, and accompanied SSA DeAndre to Defendant's hospital room where SSA DeAndre notified Defendant that Agent Bauer was dead. Agent Hannah also left the conference room with another FBI agent, SSA DeAndre, and the TIGTA agent to speak with Defendant's wife (outside the presence of the Defendant) who told them that he was making suicidal statements and that she did not know if he was going to be okay. The FBI agents offered assistance from the FBI Employee Assistance Program because she did not think IRS-CI had similar resources available. Finally, Agent Hannah left the conference room to accompany an agent from Treasury Inspector General for Tax Administration (TIGTA) to the Defendant's room after he told her that TIGTA was investigating the events at the range. While in the Defendant's room, however, the TIGTA agent told Defendant that he was there in an unofficial capacity and was solely there as a friend if he needed anything. Agent Hannah left SCMC at approximately 4:40 p.m. and headed to the scene at the FCI firearms range.

Defendant diagnosed with an acute stress reaction by the Emergency Department doctor. According to the defendant's medical records from SCMC, when he was admitted to the Emergency Department, Defendant initially received only IV fluids (sodium chloride) and declined anxiety medication offered by the attending physician. Defendant later requested anxiety medication after 3:00pm, after he had been informed by SSA DeAndre that Agent Bauer had died. The Defendant was not on any medication at the time

he made the statements he now seeks to suppress.

**II. LAW AND ARGUMENT**

A. Brown's Statements at SCMC Were Spontaneous and Not a Result of Interrogation

It is well-settled that a suspect must be advised of his *Miranda* rights prior to custodial interrogation. *Dickerson v. United States*, 530 U.S. 428, 444 (2000). However, police officers may ask questions reasonably necessary to secure their own safety or the safety of the public, and a defendant's statements in response may be admissible even if the defendant is in custody and *Miranda* warnings have not been provided. *New York v. Quarles*, 467 U.S. 649 (1984). Spontaneous statements volunteered by a suspect in absence of *Miranda* warnings are admissible because they are not a result of custodial interrogation. *United States v. Sherwood*, 98 F.3d 402, 409 (9th Cir. 1996) (citing *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981)).

Brown's statements in his hospital room —"I am a Use of Force Instructor, I should know better, I teach this"—were spontaneous statements, not a response to questioning from anyone, thus, they are admissible.

B. Brown's Statements Were Voluntary

The question of voluntariness must be determined from a consideration of the totality of the circumstances. *Withrow v. Williams*, 507 U.S. 680, 693 (1993); *United States v. Preston*, 706 F.3d 1106, 1113 (9th Cir. 2013). Factors to be considered in this analysis include "the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age." *Brown v. Howell*, 644 F.3d 969, 979 (9th Cir. 2011) (citing *Withrow*, 507 U.S. at 693–94). Ultimately, the determination to be made is whether the "suspect's will was overborne." *Haynes v. Washington*, 373 U.S. 503, 513–14 (1963).

When a confession or admission is challenged, the government need only establish voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981). The focus is on whether the confession was obtained through interrogation techniques "so offensive to a

civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985).

Title 18, United States Code, Section 3501, mandates that a confession shall be admissible in evidence if it is voluntarily given. In determining the voluntariness of an in-custody confession, 18 U.S.C. § 3501(b) provides a list of factors that trial judges are to consider, although the "presence or absence" of any of the factors is not conclusive on the issue of voluntariness.[1] Consequently, there are many reported decisions upholding the constitutionality of confessions despite one or more negative factors.[2]

Coercive police activity is "a necessary predicate" to finding a confession involuntary. *United States v. Kelley,* 953 F.2d 562 (9th Cir. 1992) (citing *Colorado v. Connelly,* 479 U.S. 157, 164 (1986). Examples of overreaching include lengthy questioning, deprivation of food or sleep, and physical threats of harm. *Id.* There must be some causal connection between the police conduct and the confession. *Id.* No such conduct occurred in this case.

Brown argues that his statements were made involuntarily. But considering the totality of circumstances, this Court should reject Brown's claim. First, as noted above,

---

[1] "The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including . . . (2) whether such defendant knew the nature of the offense with . . . which he was suspected at the time of making the confession,(3) whether or not such defendant was advised or knew that he was not required to make any statement and that such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel, and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession. 18 U.S.C. § 3501(b).

[2] *See, e.g.*, *United States v. Coleman,* 208 F.3d 786, 791 (9th Cir. 2000)(rejecting Defendant's argument the his symptoms of heroin withdrawal rendered his statements involuntarily); *United States v. Martin,* 781 F.2d 671, 673-74 (9th Cir. 1985 )(holding that the defendant's statements were voluntary despite the fact the defendant's medicine left him groggy and in pain); *United States v. Orso,* 266 F.3d 1030, 1039 (9th Cir. 2001) (en banc) (misrepresentations made by law enforcement in obtaining a statement, while reprehensible, does not necessarily constitute coercive conduct); *United States v. Bautista-Avila*, 6 F.3d 1360 (9th Cir. 1993)( the officers suggesting that, for purposes of sentencing, it would be in defendant's best interest to confess).

Brown's statements were not made in response to any questioning. Instead, his statements were spontaneous, not the product of interrogation, and are therefore admissible.

Further, Defendant was not in custody, nor was there coercive conduct on the part of the investigating agents. To the contrary, Agent Hannah determined it would not be appropriate to interview Defendant based on her observations of his demeanor, so she did not ask him any questions about what happened at the range.

### III. CONCLUSION

Based on the foregoing, the United States requests that the Court deny Defendant's Motion to Suppress Statements.

Respectfully submitted this 16th day of October, 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

s/Monica E. Ryan

MONICA E. RYAN
NATHANIEL J. WALTERS
Assistant U.S. Attorneys

Copy of the foregoing served electronically or by other means this 16th day of October, 2024, to:

All ECF Recipients