Dr. Kenji Inaba
Kenji Inaba, BS, MS, MD, FRCSC, FACS
Division of Trauma and Surgical Critical Care
Los Angeles General Medical Center
Inpatient Tower, Room C5L100
2051 Marengo Street
Los Angeles, CA 90033
(323) 409-8597

December 16, 2024

Jason D. Lamm, Esq.
Law Office of Jason Lamm
2501 N. Seventh Street
Phoenix, Arizona 85006

Jeffrey Jacobson, Esq.
Jacobson Law Firm
570 Columbus Blvd., Suite B
Tucson, Arizona 85711

> **RE: United States of America vs. Larry Brown**
> **United States District Court, District of Arizona**
> **Case No.: 24 CR 0355 SPL**

Dear Attorneys Lamm and Jacobson:

Thank you for retaining me to evaluate the circumstances of the August 17, 2023 shooting incident at the Federal Correctional Institute shooting range near Phoenix, Arizona that resulted in the death of Internal Revenue Service Criminal Investigation Division Special Agent Patrick Bauer.

I have studied the FBI narrative reports, records of the Phoenix and Daisy Mountain Fire Departments, medical records of the decedent from HonorHealth Deer Valley, and the Medical Examiner's report. Please note that if any additional material becomes available for my review, a supplementary report may be necessary.

1

In expressing my opinions below, I will endeavor to avoid making credibility determinations because it is my understanding that it is the jury's role to resolve conflicts or discrepancies between witnesses.

**My Qualifications for Reviewing this Case**

My medical qualifications and a list of my published works are more fully set forth in my *curriculum vitae*.

Briefly, I am a Professor of Surgery at the University of Southern California Keck School of Medicine. I am the Vice Chair of the Department of Surgery, the Program Director for the General Surgery Residency Training Program and the Chief of Trauma, Emergency Surgery and Surgical Critical Care at the Los Angeles General Medical Center, one of the busiest academic Trauma Centers in North America. As a researcher, I have published more than 780 peer reviewed manuscripts, 510 scientific presentations, 70 textbook chapters and am the editor of 9 textbooks. I have lectured extensively, having delivered more than 500 lectures around the world. I am a member of more than a dozen surgical societies, leading initiatives such as the American College of Surgeons Stop the Bleed Program, and am a past director of the American Board of Surgery.

In addition to my role as the Chief of Trauma at USC, I am the Medical Director, and a sworn Reserve Police Officer with the Los Angeles Police Department, currently assigned to Metropolitan Division. In 2016, I completed all three levels of training as stipulated by the State of California Commision on Peace Officer Standards and Training and am an active certified Level I Reserve Police Officer. Pertinent to this case, in addition to the standard training requirements, I have completed enhanced firearms training to include the LAPD Firearms Semi-auto Pistol 1911, LAPD Firearms Sighting Systems Pistol Mounted Optics, LAPD Firearms Patrol Rifle Program and Federal Bureau of Investigation Firearms Instructor Course. As part of the LAPD Metropolitan Division required ongoing firearms maintenance of competency, I qualify monthly on three primary weapons systems to include the STI 9mm pistol, Benelli M4 12G shotgun and HK 416 5.56mm rifle.

Exhibit A is a list of all other cases in which, during the previous 4 years, I have testified as an expert at trial or by deposition.

## Materials Reviewed

In no particular order, I reviewed the following documents (identified by Bates number):

**Production 01 - 0177-830**
**Production 01 - 0831-840**
**Production 01 - 0841-950**
**Production 01 - 0959-964**
**Production 01 - 0965-970**
**Production 01 - 0971-978**
**Production 01 - 0979-1309**
**Production 01 - 1311-1321**

## Facts On Which My Opinions Are Based

There are a number of significant facts evident in the material submitted for my review which form a landscape of circumstances known thus far that must be considered in any evaluation of this incident.

## Background

### A. The Incident

On August 17, 2023, Internal Revenue Service Special Agents were engaged in training exercises at the Federal Correctional Institute near Phoenix. Special Agent Brown taught defense tactics to Special Agents near the firearms range, while Special Agent Bauer was in the firearms range tower immediately adjacent to the range where other Special Agents were shooting. After training concluded, Special Agents Brown and Bauer were both armed with their duty weapons and were in the tower. At approximately 1105, a single shot was fired from Special Agent Brown's gun. The bullet struck Special Agent Bauer in the torso. No one else was present in the tower at the time the gun discharged.

Special Agent Brown immediately summoned medical assistance by calling 911, rendered medical aid to Special Agent Bauer by placing a chest seal on the wound, and alerted other federal law enforcement (Immigration and Customs Enforcement (ICE)) Deportation Officers who were also doing firearms qualifications at the same facility, on a different range. The Deportation Officers

did not clearly hear what Special Agent Brown said as to what had occurred, but understood that medical assistance and an AED were needed at the tower.

The Deportation Officers immediately responded to the tower where the shooting occurred. Special Agent Bauer, who was still in the tower, was alert and oriented. The Deportation Officers requested that they immediately transport Special Agent Bauer to a hospital in their vehicle as it would be more expeditious than waiting for an ambulance to arrive. One of the IRS agents on scene, however, declined that request and insisted that they wait for an ambulance. The option of transport by helicopter was also discussed and declined. Agent Brown, however, was not involved in that discussion.

### B.  EMS/Fire Response and Transportation

Phoenix Fire Department Engine 56 initially responded to the scene and arrived at 1122. However, this unit was not equipped to transport Special Agent Bauer to a hospital. At 1126, an ambulance from the Daisy Mountain Fire Department arrived in Rescue 146. Special Agent Bauer was evaluated, placed on a gurney, taken out of the tower, put into Rescue 146, and departed the scene at 1130, approximately 25 minutes after the injury occurred.  Rescue 146 transported the patient to HonorHealth Deer Valley Hospital, a Level I trauma center.  Rescue 146 with Special Agent Bauer arrived at the Trauma Center at 1144. Special Agent Bauer was resuscitated and ultimately taken into surgery. Unfortunately, efforts to treat him were unsuccessful and he was pronounced dead at 1257.

### C.  Review of HonorHealth Medical Records

On arrival at the Trauma Center, Special Agent Bauer was awake and alert, GCS 15, complaining of severe abdominal pain.  He appeared pale and diaphoretic with a single gunshot injury to the left upper quadrant of the abdomen. The patient was evaluated by the trauma team including Emergency Medicine, Anesthesia and Trauma Surgery.  On examination, the patient was tachycardic, and a blood pressure could not be obtained. Immediately after arrival, the patient deteriorated clinically and was intubated, a massive transfusion initiated, and was transferred emergently to the Operating Room. This occurred approximately 22 minutes after arrival.

In the Operating Room, a trauma laparotomy was performed. Approximately 2 Liters of hemoperitoneum was present on entry, and the following injuries were noted:  Supra-renal Inferior Vena Cava, Pancreas, and

4

Stomach. Special Agent Bauer's pulses became unobtainable, and a Resuscitative Thoracotomy with aortic cross-clamping and direct cardiac resuscitation was attempted with no return of spontaneous circulation.

The Inferior Vena Cava injury was described in the Operative Note as being 4 cm in length, just below the liver border. A REBOA catheter was utilized to visualize the injury, however at this point the patient was unable to be resuscitated with no cardiac activity for over 20 minutes and further resuscitation and surgical intervention was declared futile.

Approximately 30 units of Packed Red Blood Cells, 13 units of Plasma, 2 units of platelets and 1 unit of cryoprecipitate were administered.

### D. Medical Examiner's Report

The Medical Examiner's report dated August 18, 2023 documents a gunshot wound in the upper medial left abdomen of indeterminate range. There is perforation of the abdominal cavity with injuries to the inferior vena cava, stomach, pancreas, liver, superior pole of the right kidney and right hemidiaphragm. Approximately 1L of blood was found in the right thoracic cavity. A projectile was found in the right thorax. This would be consistent with a trajectory that goes from front to back, left to right and upwards.

## Opinions

### A. Role of Evacuation to a Trauma Center

A series of studies conducted in the Philadelphia area by the trauma research team at the University of Pennsylvania[1-2] evaluated the outcomes of trauma patients who had sustained penetrating injuries that were transported by police versus Emergency Medical Services. Direct transport to the hospital by police, in their police cars instead of waiting for Emergency Medical Services had increased over time, and was demonstrated in these studies to increase survival in those patients who had sustained the most severe injuries. The concept of "scoop and run" is a guiding principle of pre-hospital care for trauma patients in North America. This is because for trauma patients like Special Agent Bauer, hemorrhage remains the most common cause of preventable death, and the most critical step is to get the patient into an Operating Room within a Trauma Center where definitive hemorrhage control can take place. The key variable that needs to be as short as possible is the time from injury to hospital arrival because every second counts for patients with uncontrolled, ongoing non-compressible internal

5

hemorrhage. As a direct result of this, because Law Enforcement is often first on scene, the concept of Police based transport has gained traction across the country. In 1996, Philadelphia codified a policy of Police transport to a trauma center for patients with penetrating injuries, in order to avoid the time required for Emergency Medical Services to arrive, evaluate and package the patient and initiate transport. As demonstrated by their research, this has saved lives. Since this time, numerous police departments in other major urban areas, including the Los Angeles Police Department, have adopted similar protocols, particularly in cases where police officers are shot in the line of duty.

Given the remote location of the FCI range with respect to the nearest trauma center, it would have been more expedient for the IRS or ICE agents to transport Special Agent Bauer. There were several agents on scene with medical training that would have been able to provide care for him while en route. As an alternative, the agents could have transported Special Agent Bauer to a coordinated rendezvous location where the local EMS could have met the transporting agents to either accompany the agents to the hospital, or transferred Special Agent Bauer to the care of the paramedics for the remainder of the journey to the trauma center.

### B.   Deficient Safety Protocols at the FCI Range

It is an accepted reality that accidents can and will happen in firearms training environments. The resulting harm that results from such accidents, however, can be significantly mitigated by the implementation of emergency action plans and the presence of personnel on scene who have training to deal with gunshot wounds and other serious injuries.

An emergency action plan involves ensuring that all persons present are made of aware of any number of factors that include, but are not limited to 1) the individual(s) who will be initiating contact with the 911 system; 2) the location of medical equipment on scene 3) the individual(s) who are responsible for providing medical care; 4) the physical location where EMS will respond to; 5) the individual(s) designated to act as a pathfinder at the entrance to the training facility to guide EMS to the exact location of the patient; 6) when required for evacuation, the physical location of the landing zone for rotary or fixed wing aircraft; 7) the name, location and contact information for the nearest Trauma Center; 8) identification and location of the vehicle(s) that will be used for patient evacuation; 9) the location of the keys to said vehicle(s); 10) the identity of the personnel who will be driving said vehicle(s); 11) the driving route that will be taken to the designated hospital; will respond to; 12) the identity of the local

6

incident commander who will coordinate the response and make appropriate notifications.

An emergency action plan must be reviewed prior to the commencement of each and every training exercise being conducted, with all of the instructors, students and observers present. Failing to review an emergency action plan prior to the commencement of a training exercise involving the discharge of firearms constitutes a breach of the applicable standard of care and increases the likelihood and degree of harm that can result from a medical emergency.

While there is evidence to suggest that agents who were present at the FCI range on August 17, 2023 participated in a safety briefing prior to the commencement of training, my review of the records in this case does not suggest that an emergency action plan was reviewed with participating agents, or that one even existed.

The totality of the aforementioned circumstances, as well as others that I have reviewed in the records provided to me, suggest that the absence of an emergency action plan on August 17, 2023 constituted not only a breach of the applicable standard of care, but also a gross deviation from the prevailing norms and practices of law enforcement on that day. These departures significantly contributed to a significant delay in Special Agent Bauer being evacuated to a Trauma Center for surgical intervention, and represent a direct causal factor in his ultimate death.

### C.    Impact of the Delay in Definitive Hemorrhage Control

Immediately after the injury occurred, the 911 system was contacted to initiate an EMS response. At this point, there was a significant delay, of upwards of 25 minutes, prior to the arrival of EMS, evaluation, packaging and departure of the injured Special Agent. Importantly, there were no life sustaining treatments that were performed in the field during this significant delay, or en route to the Trauma Center, that ultimately impacted the survival of Special Agent Bauer. This delay simply prolonged the time period before he could access what he really needed, which was surgical control of the Inferior Vena Cava injury in the Operating Room. By the time he arrived at the Trauma Center, he was in peri-cardiac arrest, secondary to massive blood loss, which started immediately after the injury and was ongoing until he ultimately underwent surgical intervention. By the time Special Agent Bauer arrived at the Trauma Center, it was too late. Despite immediate initiation of resuscitation and transfer to the Operating Room for definitive surgical control, Special Agent Bauer's heart had

stopped beating, and he was unable to be resuscitated. Had he arrived at the Trauma Center earlier, he would not have been in cardiac arrest and the surgical team would have had the opportunity to identify, and definitively repair or shunt the injury.

**Conclusions**

The absence of an emergency action plan at the FCI range on August 17, 2023 represented a gross deviation from the accepted standard of care and norms in law enforcement. The absence of such a plan caused confusion, uncertainty, and a delay in the evacuation and administration of emergency medical care, to include surgical intervention, to Special Agent Bauer.

This, combined with the resulting delay in transporting Special Agent Bauer to a hospital for emergency care represented an independent and superseding cause of the death of Special Agent Bauer. Specifically, and to a reasonable degree of medical certainty, it is more likely than not that Special Agent Bauer would have survived his injuries but for the delay in being transported to a hospital, and the resulting delay in surgical intervention and other efforts to save his life.

I declare under penalty of perjury that the foregoing is true and correct.

Executed December 16, 2024 at Los Angeles, California.

Dr. Kenji Inaba, MD FACS

## References

1. Winter, E. et al.  Coming in hot:  Police transport and pre-hospital time after firearm injury.  Journal of Trauma and Acute Care Surgery.  2022.  93(5):656-663.
2. Winter, E. et al.  Association of Police transport with survival among patients with penetrating trauma in Philadelphia, Pennsylvania.  JAMA Network Open.  2021.  4(1):e2034868.